1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10

11   PACIFIC MERCHANT SHIPPING          No. 2:09-cv-01151-MCE-EFB
     ASSOCIATION ("PMSA"), a
12   California Mutual Benefit
     Corporation,
13
              Plaintiff,
14
         v.                             AMENDED MEMORANDUM AND ORDER[1]
15
     JAMES GOLDSTENE, in his
16   official capacity as
     Executive Officer of the
17   California Air Resources
     Board,
18
              Defendant,
19
     NATURAL RESOURCES DEFENSE
20   COUNCIL, INC., COALITION FOR
     CLEAN AIR, INC., and SOUTH
21   COAST AIR QUALITY MANAGEMENT
     DISTRICT,
22
              Defendants-Intervenors.
23

24   ///

25   ///

26   ─────────────────────
          [1] The sole purpose of this Amended Memorandum and Order is
27   to certify the Court's decision as amenable to immediate appeal
     under 28 U.S.C § 1292(b).  Otherwise it is identical to its
28   June 30, 2009 predecessor.

                                    1

Through the present action, Plaintiff Pacific Merchant Shipping Association ("PMSA" or "Plaintiff") seeks to prevent implementation of regulations recently adopted by the California Air Resources Board ("CARB"), and scheduled to go into effect on July 1, 2009.  Plaintiff sues Defendant James Goldstene, as CARB's Executive Director, on grounds that the regulations in question, which seek to specify fuel requirements for seagoing vessels traveling within twenty-four nautical miles of the California coast, are unconstitutional and contrary to federal law.  In now moving for summary judgment, Plaintiff seeks declaratory and injunctive relief that the regulations are preempted by the federal Submerged Lands Act, 43 U.S.C. §§ 1301, et seq.  CARB opposes Plaintiff's Motion.  In addition, the Natural Resources Defense Council, Inc. ("NRDC"), the Coalition for Clean Air, Inc. ("CCA") and the South Coast Air Quality Management District ("SCAQMD"), who have intervened in support of CARB, join in opposing Plaintiff's Motion.

For the reasons set forth below, Plaintiff's Motion will be denied.

**BACKGROUND**

On April 16, 2009, the CARB regulations at issue in this matter were transmitted to the California Secretary of State for filing pursuant to California Government Code § 11349.3.  Under the terms of the regulations, enforcement will commence on July 1, 2009.

///

2

The express purpose of the regulations (hereinafter referred collectively as the "Vessel Fuel Rules" or the "Rules") is to reduce air pollutants affecting the State of California by requiring ocean-going vessels[2] to use cleaner marine fuels. Under the Rules, vessel operators are required to use cleaner marine fuels in diesel and diesel-electric engines, main propulsion engines, and auxiliary boilers on vessels operating within twenty-four nautical miles off the California coastline. Cal. Code Regs. tit. 13, § 2292.2(a); tit. 17, § 93118.2(a). Implementation is contemplated in two phases.  Initially, beginning in July 2009, vehicle operators must use either marine gas oil (which typically averages 0.3% sulfur and is capped at 1.5%), or marine diesel oil with a sulfur limit of 0.5% or less. Thereafter, by January 2012, both fuels must not exceed 0.1% sulfur.  Id.  Failure to comply with the regulations subjects vessel owners and operators penalties, injunctive relief and other remedies as provided under California law.  Id. at § 2299.2(f)(1); § 93118.2(f)(1).

According to the State of California, ocean-going vessels, which typically utilize large diesel engines, are a significant source of air pollution in California, due in part to their widespread use of low-grade bunker fuel.  Bunker fuel consists primarily of thick, tar-like residual fuel formulated from the residues remaining after primary fuel distillation.

---

[2] The Rules define "ocean-going vessel" as a vessel that is either registered under a foreign flag, has a overall length of more than 400 feet, weighs in at a gross registered tonnage in excess of 10,000, or is propelled by a marine compression engine with a per-cylinder displacement of 30 liters or more.  13 Cal. Code Regs. § 2299.2(d) and 17 Cal. Code Regs. § 93118.2(d).

Decl. Of Paul Milkey in Support of CARB's Opp'n to Mot. for Summ. J., ¶ 16.  As a result of its viscous nature, bunker fuel has to be heated before it can be pumped and injected into an engine for combustion.  NRDC/CCA Undisputed Fact ("UF") No. 5.  Residual fuel contains an average of about 25,000 parts per million (ppm) of sulfur, as opposed to diesel fuel for trucks and other motor vehicles, which is limited to 15 ppm sulfur.  Id. at No. 6.  The proposed Vehicle Fuel Rules mandate that ocean-going vessels coming into California ports use distillate fuel with a maximum sulfur level falling between these two extremes.

2006 data generated by CARB suggests that ocean-going vessels traveling within twenty-four nautical miles of California's coast generate approximately 15 tons per day of diesel particulate matter ("PM"), 157 tons per day of nitrogen oxides ("NOx"), and 117 tons daily of sulfur oxides ("SOx").  CARB UF No. 1.  This makes SOx emissions from such vessels the single largest source of SOx emissions in the state, responsible for some forty percent of all SOx emitted.  Milkey Decl., ¶ 13.  Importantly, too, both NOx and SOx are precursors of PM2.5, or fine particulate matter pollution.  SCAQMD UF No. 17.  The PM emissions from ocean-going vessels are also significant and have been estimated as equivalent on a daily basis to approximately 150,000 big rig trucks traveling 125 miles per day.  Milkey Decl., ¶ 13.

///

///

///

///

Long Beach and Los Angeles ports are collectively constitute the largest port in the United States.  Some forty percent of all national imports are estimated to move though those two California ports.  <u>See</u> Decl. of Dr. Elaine Chang in Support of SQAMD's Opp. to Mot. for Summ. J., ¶ 27.  Research shows that pollutants discharged offshore migrate to the California coast. Vehicle emissions are likely to be transported onshore from even beyond the twenty-four nautical mile boundary used in the Rules. SCAQMD UF No. 8.

PMSA does not dispute that implementation of the Vessel Fuel Rules, which were adopted following a lengthy process which included consultation with both the public, state and local agencies, and the federal government, is estimated to reduce PM emission by 13 tons per day, NOx by 10 tons per day, and SOx by 109 tons per day.  <u>See</u> CARB UF No. 6.  For sulfur oxides, that reduction amounts to some ninety percent fewer estimated emissions upon full implementation of the Rules.  SCAQMD UF No. 30   PMSA does not contend that compliance with the new Rules is technically impossible or even difficult. NRDC UF No. 22. Only costs are cited.  It nonetheless appears that compliance would increase costs of imported goods by an insignificant amount.  <u>See</u> NRDC UF No. 23.

From a public health and safety perspective, it is undisputed that twenty-seven million Californians, or eighty percent of the population, are exposed to ocean-going emissions that increase cancer risks.  CARB UF No. 4, SCAQMD UF No. 41.

///

///

Diesel emissions are known to cause premature death, cancer, aggravated asthma and other respiratory illnesses, and increased risk of heart disease.  CARB UF Nos. 10, 11.  The problem particularly prevalent in the Southern California area encompassed by the South Coast Air Basin, where over eighty percent of the population is exposed to PM2.5 levels exceeding federal standards.  SCAQMD UF No. 22.  In fact, CARB has calculated that over fifty percent of the total population-weighted exposure to PM2.5 levels exceeding federal standards in the entire nation occurs in the South Coast Air Basin, although the Basin has only five percent of the nation's population.  Id. at No. 23.  Not surprisingly, the South Coast Air Basin has consequently been unable to attain national air quality standards.

CARB estimates that directly-emitted diesel particulate matter from ocean-going vehicles causes about 300 premature death statewide every year, not including cancer effects.  SCAQMD UF No. 45.  In contrast, research indicates that implementation of the Vessel Fuel Rules between 2009 and 2015 alone will prevent some 3,500 premature deaths, nearly 100,000 asthma attacks, and significantly reduce cancer risk.  NRDC/CCA UF No. 14.

///

///

///

///

///

///

///

1    Plaintiff PMSA is an organization whose members own and

2  operate U.S. and foreign-flagged ocean-going vessels subject to

3  the proposed new Vessel Fuel Rules.  As indicated above, PMSA now

4  moves for summary judgment and seeks a judicial determination

5  that the Rules at issue are preempted by the SLA, or are

6  otherwise unlawful.  PMSA further requests that a permanent

7  injunction be issued against enforcement of the regulations more

8  than three nautical miles seaward from the California coast.

9

10                              **STANDARD**

11

12    The Federal Rules of Civil Procedure provide for summary

13  judgment when "the pleadings, depositions, answers to

14  interrogatories, and admissions on file, together with

15  affidavits, if any, show that there is no genuine issue as to any

16  material fact and that the moving party is entitled to a judgment

17  as a matter of law."  Fed. R. Civ. P. 56(c).  One of the

18  principal purposes of Rule 56 is to dispose of factually

19  unsupported claims or defenses.  <u>Celotex Corp. v. Catrett</u>, 477

20  U.S. 317, 325 (1986).  Under summary judgment practice, the

21  moving party

22         "always bears the initial responsibility of informing
           the district court of the basis for its motion, and
23         identifying those portions of 'the pleadings,
           depositions, answers to interrogatories, and admissions
24         on file together with the affidavits, if any,' which it
           believes demonstrate the absence of a genuine issue of
25         material fact."

26  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting

27  Rule 56(c).

28  ///

                                  7

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-587 (1986); First Nat'l Bank v. Cities Ser. Co., 391 U.S. 253, 288-289 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 14 Wall.442, 448, 20 L.Ed. 867 (1872)).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ...

8

1   Where the record taken as a whole could not lead a rational trier

2   of fact to find for the nonmoving party, there is no 'genuine

3   issue for trial.'" Matsushita, 475 U.S. at 586-87.

4

5                              **ANALYSIS**

6   **A.   Plaintiff Has Not Shown As A Matter Of Law That The**
        **Vessel Fuel Rules Are Preempted By The SLA, As It Must**
7       **To Prevail On Summary Judgment.**

8        **1.   Purpose of the SLA.**

9

10       The SLA sets the geographic boundary of the State of

11  California at three geographical miles seaward of the State's

12  coastline.  43 U.S.C. § 1312; United States v. California, 381

13  U.S. 139, 148 (1965).  The SLA was enacted in 1953 to restore

14  state ownership and control over the ocean seabed up to three

15  miles offshore and to promote the harvesting of natural

16  resources, namely oil and gas.  43 U.S.C. §§ 1311, 1312,

17  Judiciary Committee Report, H.R. Rep. No. 83-215 (1953),

18  reprinted in U.S.C.C.A.N. 1385, 1386.  Passage of the SLA was

19  precipitated by a 1947 Supreme Court decision holding that the

20  federal government was the exclusive owner of all submerged lands

21  and any minerals found therein.  United States v. California, 332

22  U.S. 19 (1947).  Because California's law had previously

23  delineated California's sea boundary as extending three miles

24  into the Pacific Ocean (see People v. Weeren, 26 Cal. 3d 654, 660

25  (1980)), and because California had entered into leases for the

26  extraction various natural resources from the seabed based on

27  those perceived boundaries, the SLA was enacted to restore state

28  historic ownership of submerged lands.

1    There is no indication in either the SLA itself, or within

2  its legislative history, to suggest that Congress intended the

3  SLA to prevent coastal states like California herein from

4  regulating offshore air pollution from ocean-going vessels.

5  Although by its terms, state ownership and control is limited to

6  submerged lands and their overlying navigable waters within three

7  miles of the coastline, available case law indicates that state

8  regulation may extend beyond that boundary under appropriate

9  circumstances.

10    With respect to pilotage, anchorage and mooring, for

11  example, the Supreme Court has long recognized that such rules

12  are best left to the state absent compelling governmental

13  interest to the contrary.  Significantly, in <u>Gillis v. Louisiana</u>,

14  294 F.3d 755 (5th Cir. 2002), the Fifth Circuit held that

15  Louisiana's regulation of pilotage, even outside the three-mile

16  limit, is not preempted by the SLA.  As the <u>Gillis</u> court

17  reasoned:  "The Submerged Lands Act addressed only who retains

18  title to submerged lands both within and beyond the three-mile

19  line with particular reference to ownership and exploration of

20  natural resources in the seabed and subsoil.  It does not address

21  the regulation of pilotage on the waters above."  <u>Id</u>. at 762.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

Similarly, in Warner v. Dunlap, 532 F.2d 767 (1st Cir. 1976), the First Circuit rejected an analogous SLA preemption challenge, state that "[s]tates have been permitted to assert their pilotage regulations at distances considerably greater than three miles from their shores.... and there is no statutory or other basis for imposing a three-mile limit on such regulation." Id. at 772.[3]

The Court is well aware that pilotage, which establishes an integrated system for ship navigation, is different than fuel regulations designed to control offshore pollutants from migrating offshore. Both Warner and Gillis nonetheless stand for the proposition that given the limited purpose of the SLA, it should not be applied mechanically in overriding all state regulation beyond three miles from a state's coastline. With that flexible approach in mind, we now turn to whether the particular Vessel Fuel Rules at issue in this litigation are preempted by the SLA, as Plaintiff contends.

**2.  Principles of Preemption.**

Federal preemption of state statutes or regulations can be either express or implied. Express preemption occurs when Congress "explicitly state[s]" that it intends a statute to have that effect.

---

[3] The leading Ninth Circuit case on the interface between state regulation of coastal waters and the provisions of the SLA, Barber v. Hawai'i, 42 F.3d 1185 (9th Cir. 1994), does not specifically address whether states have authority to promulgate regulations beyond three miles seaward.

11

1  Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977).  Here it is

2  undisputed that the SLA does not expressly preempt the Vessel

3  Fuel Rules; rather, Plaintiff's only argument is that the Rules

4  are preempted by implicit field preemption.  Field preemption

5  applies only when state law "regulates conduct in a field that

6  Congress intended the Federal Government to occupy exclusively."

7  English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990).  "Such an

8  intent may be inferred from a scheme of federal regulation.... so

9  pervasive as to make reasonable the inference that Congress left

10  no room for the State to supplement it, or when an Act of

11  Congress 'touch[es] a field in which the federal interest is so

12  dominant that the federal system will be assumed to preclude

13  enforcement of state laws on the same subject."  Id. (internal

14  quotations omitted); see also Ray v. Atlantic Richfield Co., 435

15  U.S. 151, 157 (1978).

16      In assessing the merit of Plaintiff's field preemption

17  argument, then, the Court's "sole task is to ascertain the intent

18  of Congress."  PMSA v. Aubry, 918 F.2d 1409, 1415 (9th Cir.

19  1990).  Field preemption applies only where the congressional

20  intent to preempt state law is "clear and manifest."  Sprietsma

21  v. Mercury Marine, 537 U.S. 51, 69-70 (2002).  Moreover, a

22  presumption against preemption applies to protect a state's

23  historic police power in protecting the health and safety of its

24  citizenry, unless the clear and manifest purpose of Congress

25  dictates otherwise.  Rice v. Santa Fe Elevator Corp., 331 U.S.

26  218, 230 (1947).  This is because states have regulated health

27  and safety issues throughout the nation's history.  Medtronic,

28  Inc. v. Lohr, 518 U.S. 470, 475 (1996).

12

1      PMSA argues, relying on United States v. Locke, 529 U.S. 89

2  (2000), that this presumption does not apply because the Vessel

3  Fuel Rules bear upon maritime commerce.  Locke is factually

4  distinguishable from the present case, however, because the state

5  regulations at issue in that case served precisely the same

6  purpose as analogous provisions of federal law under the Ports

7  and Waterways Safety Act of 1972 ("PWSA").  The issue in Locke

8  was consequently not whether any maritime regulation is

9  inherently federal; instead the Court had to consider the scope

10  of appropriate local regulation under the narrow confines of the

11  PWSA.  Fednav, Ltd. v. Chester, 547 F.3d 607, 622 (6th Cir.

12  2008).

13      The Supreme Court, in its recent decision in Wyeth v.

14  Levine, 129 S. Ct. 1187 (2009) clarified that the proper analysis

15  for determining application of the presumption against preemption

16  is not the absence of federal regulation, but instead the

17  historic presence of state law.  Id. at 1195 n.3.  The state law

18  being applied here relates to pollution, not maritime commerce.

19  "Air pollution prevention falls under the broad police powers of

20  the states, which include the power to protect the health of

21  citizens in the state.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

13

1    <u>Exxon Mobil Corp. v. U.S. Envtl. Prot. Agency</u>, 217 F.3d 1246,

2    1255 (9th Cir. 2000); <u>Huron Portland Cement Co. v. City of</u>

3    <u>Detroit</u>, 362 U.S. 440, 442 (1960) ("Legislation designed to free

4    from pollution the very air that people breathe clearly falls

5    within the exercise of even the most traditional concept of what

6    is compendiously known as the police power," an area in which the

7    states may act).[4]

8        Significantly, too, in enacting the Clean Air Act, 42 U.S.C.

9    § 7401 et seq., Congress itself pointed to state authority in

10   preventing air pollution.  As the Ninth Circuit explains:

11       "States retain the leading role in regulating matters
         of air quality: "air pollution prevention (that is, the
12       reduction or elimination, through any measures, of the
         amount of pollutants produced or created at the source)
13       and air pollution control at its source is the primary
         responsibility of States and local government." 42
14       U.S.C. § 7401(a)(3).

15   <u>Exxon Mobil Corp. v. U.S. Envtl. Prot. Agency</u>, 217 F.3d at 1254.

16       In short, because pollution is an area falling within

17   police powers historically delegated to the states, the

18   presumption against preemption applies in this case.  Given that

19   presumption, we now move to whether there is any basis for field

20   presumption that will overcome it.

21

---

22       [4] In arguing that consistent federal standards in
     implementing pollution standards is paramount, Plaintiff points
23   to language from the Supreme Court's decision in <u>Chevron U.S.A.,</u>
     <u>Inc. v. Hammond</u>, 726 F.2d 483 (1982) to the effect that federal
24   interest in uniformity is paramount "as to environmental
     regulation of deep ocean waters....beyond our nation's
25   jurisdiction." <u>Id.</u> at 492 n.12.  That language does not apply
     here, however, inasmuch as the United States has established a
26   24-mile contiguous zone for purposes of exercising territorial
     control.  <u>See, e.g.</u>, Presidential Proclamation No. 7219
27   (August 2, 1999).  The area at issue in this case falls within
     that twenty-four mile zone and does not extend to international
28   deep waters falling outside that boundary.

### 3. Plaintiff has not established that the SLA provides a basis for field preemption in this case.

In order to invoke field preemption against a state law, the state law must also have some "direct and substantial effect" on the allegedly preempted field, here navigation and commerce. English v. Gen. Elec. Co., 496 U.S. at 85. Therefore, a federal "interest" in navigation and commerce alone does not suffice, if that interest is not sufficiently pervasive. Id.

No evidence has presented by PMSA that the challenged Rules would in any way impede commerce or navigation. PMSA admits that compliance with the Rules is not technically impossible or even difficult. NRDC/CCA UF No. 22. PMSA has not shown that the required fuel is unavailable. It has not argued that use of cleaner fuel would adversely affect ship operations. Instead, the only impairment identified is the economic impact associated with the increased cost of higher grade diesel. In that regard, PMSA argues that the Rules will cost each ship operator some $30,000.00 per vessel call in California. In placing that figure into perspective, however, any increased cost associated with compliance is less than one percent of the typical cost of a trans-Pacific voyage. Id. at No. 23. That cost has been estimated by CARB to amount to only a $6.00 increase per 20-foot shipping container, a sum that would equate to only an extra 12.5 cents in the cost of a plasma TV. SCAQMD UF No. 58, 59.

///

///

///

1  Such minimal cost increases hardly constitute a "direct and

2  substantial" effect on international commerce, as they must in

3  order to overcome the presumption against preemption that applies

4  to this case in the first place.

5       Under these circumstances, Plaintiff has not shown that he

6  is entitled to summary judgment.  Moreover, it all but defies

7  logic to argue that the Vessel Fuel Rules regulate commerce at

8  all instead of curbing air pollution.  The Rules simply require

9  ships intending to enter California ports to reduce their

10 polluting activities as they approach the California coast.  They

11 do not purport to specify who may or may not engage in commerce,

12 or who may or may not navigate in waters beyond the three-mile

13 limit.

14

15     **B.     Plaintiff Has Not Demonstrated That The Vessel Fuel**
               **Rules Are Otherwise Unlawful For Purposes Of**
16             **Establishing Its Entitlement To Summary Judgment.**

17

18      Plaintiff's primary argument in challenging imposition of

19 the Vessel Fuel Rules rests with its contention that California

20 is categorically precluded from enacting Rules extending beyond

21 three miles seaward of its coastline under principles of

22 preemption.  As set forth above, the Court disagrees.  It thus

23 becomes necessary to consider whether the proposed Rules are

24 otherwise "unlawful and impermissibly regulate navigation and

25 foreign and domestic commerce as delegated to the United States

26 Congress," or are "contrary to law" as Plaintiff contends.  See

27 Pl.'s Compl. 14:20-26.  Plaintiff has not demonstrated that it is

28 entitled to summary judgment on that basis, either.

                                16

1    Under the so-called "effects test", California may enact

2    reasonable regulations to monitor and control conduct that

3    substantially affects its territory.  In addition to failing to

4    show the requisite direct and substantial effect on maritime

5    commerce that Plaintiff must establish to invoke field

6    preemption, Plaintiff has also failed to adequately rebut

7    California's argument (and that of Intervenors) that the Vessel

8    Fuel Rules target pollution substantially affecting the State and

9    are reasonable in light of the demonstrable effects linked to

10   that pollution.  Plaintiff has therefore not shown that the

11   Vessel Fuel Rules, even to the extent they apply on an

12   extraterritorial basis, are unlawful.

13       There is no question that California can exercise its police

14   power within three nautical miles of its coastline.  The only

15   issue is whether that police power, in the form of environmental

16   regulation, can also extend seaward between three and twenty-four

17   nautical miles.

18       It should be initially noted that such regulations are not

19   contrary to precepts of international law.  Modern international

20   law permits coastal states to establish "requirements for the

21   prevention, reduction, and control of pollution of the marine

22   environment as a condition for the entry of foreign vessels into

23   their ports."[5]  It is uncontroverted that the Vessel Fuel Rules

24   at issue herein are limited to vessels visiting California ports.

25   ///

26

27       [5] See United Nations Convention on the Law of the Sea,
     http://www.un.org/Depts/los/convention_agreements/texts/
28   unclos_e.pdf).

The Rules accordingly appear consistent with traditional principles of international law allowing the imposition of port entry conditions.[6]

Under United States law, when state regulations have extraterritorial effects, the propriety of such regulations are judged against the effects test described above, which is designed to ensure that regulations with applicability beyond the geographic confines of a particular state are reasonable and directed at conduct that has a substantial effect in the state. See, e.g., Strassheim v. Daily, 221 U.S. 280, 284-85 (1911).[7]

///

[6] Plaintiff's reliance on the provisions of MARPOL Annex VI of the International Convention for the Prevention of Pollution from Ships, 1973 ("MARPOL VI") is equally unavailing.  While PMSA asserts that Congressional ratification of the MARPOL VI regulations reflect a federal interest in being the sole authority for all matters governed therein, including pollution form ocean-going vessels, Section 1911 of the implementing regulations in fact contains an express savings clause preserving state rights.  33 U.S.C § 1911.  Such a savings clause "is fundamentally incompatible with complete field preemption."  In re NOS Communications, 495 F.3d 1052, 1058 (9th Cir. 2007). In addition, there is nothing in MARPOL VI that even purports to limit the ability of a coastal state to regulate air pollution that originates offshore.

[7] Cases in several different areas confirm that where state regulations are directed at conduct having a substantial effect on the state, such regulations are upheld even if they extend beyond state territorial limits.  In addition to the Gillis and Warner cases already discussed, which deal with pilotage rules, the Ninth Circuit, in PMSA v. Aubry, 918 F.2d at 1426, held that California had a strong interest in applying its overtime pay provisions to maritime employees working on the high seas off California's coastline, given the close contacts between such employees and the State and the critical importance of their work to the State.  Additionally, in State v. Stupansky, 761 So. 2d 1027, 1035-36 (Fla. 2000), the Florida Supreme Court found that Florida properly exercised jurisdiction over a criminal assault that occurred beyond Florida's territorial waters, since no conflict with federal existed and because unprosecuted crime could have a substantial negative impact on Florida's tourism industry.

1   The effects test consequently requires that two issues be

2   addressed: first, whether the Rules regulate conduct that has a

3   substantial effect within California, and second whether the

4   regulation is reasonable.  <u>See</u> Restatement (Third) of Foreign

5   Relations Law of the United States, § 402(1)(c), § 403.  As

6   already summarized in the Background section of this Memorandum

7   and Order, the effects on California from ocean-going vessel

8   pollution are both substantial and beyond any reasonable doubt.[8]

9   The State has submitted evidence indicating that emissions from

10  vessels traveling within three and twenty-four nautical miles

11  from the California coast is blown in to California.  Decl. of

12  Daniel E. Donohoue in Support of CARB's Opp'n to Mot. for Summ.

13  J., ¶ 7.  The emissions from such vessels expose twenty-seven

14  million people, or eighty percent of the state's population, to

15  cancer risks of at least ten in a million.  <u>Id</u>. at ¶ 12; SCAQMD

16  UF No. 22.  Particulate pollution caused by vessel exhaust also

17  contributes significantly to the risk of premature death,

18  respiratory illness and heart disease.  CARB UF Nos. 10, 11.  The

19  problem is particularly pronounced in Southern California with

20  its concentration of major shipping ports of entry.

21  ///

22  ///

23  ///

24

25      [8] The Court notes that Plaintiff has objected to the
    introduction of facts concerning the scope and extent of
26  pollution occasioned by ocean-going vessels using bunker fuel as
    not material to the issues presented by its request for summary
27  judgment.  The Court overrules those objections since such facts
    are plainly relevant to both the reasonableness and impact prongs
28  of the effects test as discussed above.

Just as significantly, the benefits from implementation of cleaner fuel requirements appear equally plain.  As indicated above, PMSA does not dispute research showing that implementation of the Vessel Fuel Rules between 2009 and 2015 alone will prevent some 3,500 premature deaths, nearly 100,000 asthma attacks, and significantly reduce cancer risk.  NRDC/CCA UF No. 14.  On a percentage basis harmful emissions will be reduced by as much as ninety percent.  SCAQMD UF No. 30.  Given these tangible and far-reaching benefits, the Court is wholly unable to conclude that the Rules at issue are unreasonable.  Because the effects on California of ocean-going vessel pollution are equally plain, Plaintiff cannot establish any illegality on the basis of the effects test, and the Rules withstand summary judgment on that basis.[9]

Nor do the provisions of the Clean Air Act doom the Vessel Fuel Rules.  Although the Act does preempt states from adopting "emission standards" for marine vessels without federal authorization, such authorization is not required for "in use requirements" such as sulfur limits on fuel for existing, "in-use" marine vessels and their engines.  55 U.S.C. § 7543; Engine Mfrs Ass'n v. EPA, 88 F.3d 1075, 1094 (D.C. Cir. 1996). Additionally, the Vessel Fuel Rules in their present form avoid preemption issues by imposing a direct fuel mandate as opposed to an emissions standard.

---

[9] Although Plaintiff argues that state jurisdiction over activities affecting California could extend on an ad infinitum basis if, for example, a determination was made that polluting practices in Shanghai Harbor were found to affect California, the pervasive effect here, as well as the dramatic benefits to be gained from mandating ocean-going fuel requirements for vessels entering California ports, make resort to such an attenuated analogy misguided.

While PMSA did successfully argue Clean Air Act preemption under an earlier version of the Rules setting such standards,[10] it makes no Clean Air Act challenge to the present case.

**CONCLUSION**

For all the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED.[11]  In the opinion of the Court, however, this Order qualifies for immediate appellate review as involving "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b). This Court hereby certifies this Order as meeting those prerequisites.

IT IS SO ORDERED.

Dated: August 27, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[10] See PMSA v. Goldstene, 517 F.3d 1108 (9th Cir. 2008). While PMSA asserted both SLA and Clean Air Act preemption in that case, because the Ninth Circuit granted relief under the Clean Air Act it did not address SLA preemption.  Id. at 1115.

[11] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 78-230(h).